# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
August 23, 2010

Lyle W. Cayce
Clerk

No. 09-30870

LINDA JACKSON; BRIAN JACKSON,

Plaintiffs-Appellants

v.

TANFOGLIO GIUSEPPE S.R.L.; GIUSEPPE TANFOGLIO S.P.A.; FRATELLI TANFOGLIO DI TANFOGLIO BORTOLO & C.S.n.c., formerly known as Pacific Capital Partners of Oregon Inc.,

Defendants-Appellees

Appeals from the United States District Court
for the Eastern District of Louisiana

Before KING, HIGGINBOTHAM, and GARZA, Circuit Judges.

EMILIO M. GARZA:

This is an appeal from the district court's order granting Fratelli Tanfoglio, S.n.c.'s ("Fratelli") Rule 60(b)(4) motion to vacate a default judgment against it. The district court held that it lacked personal jurisdiction—both general and specific—over Fratelli. The plaintiffs appeal. For the reasons set forth below, we AFFIRM.

## I

This is the third time this court has been asked to review whether the district court has personal jurisdiction in this case. In May 1992, Arnold Jackson ("Jackson") was injured by the unexpected discharge of a Titan .25

caliber semi-automatic pistol (the "pistol"). Jackson was rendered a quadriplegic and eventually died from his injuries. Plaintiffs-Appellants Linda Jackson, Jackson's wife, and their son Brian (collectively, "Plaintiffs") filed suit in May 1993 against a number of defendants involved in the manufacture and sale of the pistol.[1] Among the defendants were three Italian companies: Fratelli Tanfoglio, S.n.c. ("Fratelli"); Giuseppe Tanfoglio, S.p.a. ("Giuseppe S.p.a."); and Tanfoglio Giuseppe, S.r.l. ("Giuseppe S.r.l.") (collectively, the "Tanfoglio entities").[2] None of these firms made an appearance in the case and the Plaintiffs obtained a default judgment of approximately $11 million against them in December 1998. In entering the judgment, the district court ruled that the Tanfoglio entities manufactured the pistol, which had a firing pin that was too long, making the pistol discharge too easily. The district court entered a final judgment against the Tanfoglio entities and closed the case.

Nearly two years later, Fratelli filed a Federal Rule of Civil Procedure 60(b)(4) motion to vacate the default judgment on the basis that the judgment was void because the district court lacked personal jurisdiction over it.[3] In support of its claim, Fratelli asserted that it did not make the pistol that injured Jackson, and that there was nothing connecting Fratelli with Louisiana. The district court denied the motion, holding that the jurisdictional facts—that Fratelli had made the pistol—had been conclusively established by the default judgment. On appeal, this court reversed and remanded the case for further adversarial proceedings on the issue of personal jurisdiction. *See Jackson v. FIE Corp.*, 302 F.3d 515, 531 (5th Cir. 2002) (*Tanfoglio I*).

---

[1] The frame of the pistol was manufactured by Southern Die Cast Company and the pistol itself was assembled by Firearms Import and Export Corporation ("FIE") in Florida, likely between 1970 and 1973.

[2] Over the years, all of the other defendants have been dismissed from the case.

[3] Only Fratelli appeared in the case and moved to vacate the default judgment. The default judgment is still in effect as to Giuseppe S.r.l. and Giuseppe S.p.a.

On remand, the parties engaged in considerable discovery. Plaintiffs argued that the court had specific personal jurisdiction because the Tanfoglio entities manufactured the pistol or the firing pin, and that there was general jurisdiction arising from the Tanfoglio entities' continuous and systematic contacts with the forum state. In its April 2007 order, the district court found that there was insufficient evidence to establish that: (1) Fratelli shipped any finished products or component parts to Louisiana or made the defective firing pin; (2) the actions of other Tanfoglio entities should be imputed to Fratelli; and (3) Fratelli was subject to general jurisdiction in Louisiana. *Jackson v. F.I.E. Corp.*, No. 95-2389, 2007 WL 1259216, at *3–7 (E.D. La. Apr. 30, 2007). Plaintiffs appealed and we vacated and remanded because the district court incorrectly found that Plaintiffs had not presented sufficient evidence to establish jurisdiction when it should have determined "whether there was sufficient evidence to prove that Fratelli Tanfoglio was *not* subject to the court's jurisdiction." *Jackson v. Fratelli Tanfoglio di Tanfoglio Bortolo & C.S.n.c.*, 310 F. App'x 629, 631 (2009) (per curiam) (*Tanfoglio II*).

On remand, the district court found that Fratelli met its burden of proving the lack of both specific and general personal jurisdiction, and again granted the motion to vacate the default judgment. Once again, the Plaintiffs appeal.

A brief discussion of the Tanfoglio entities is necessary for purposes of considering personal jurisdiction. Giuseppe Tanfoglio owned and operated a company in Italy which manufactured the Titan .25 caliber pistol and other firearms. In 1969, Giuseppe's brother, Bortolo, incorporated Fratelli; Giuseppe's daughter, Maria Celsa, was one of Fratelli's directors. In 1978, Giuseppe and his son, Massimo, incorporated Giuseppe S.r.l. which eventually took over the operations of Giuseppe's original company. From approximately 1969 to 1990, Giuseppe S.r.l. and Giuseppe S.r.a. sold components to FIE in Florida for use in the assembly of the Titan .25 caliber pistol. Information obtained in discovery indicates that the majority of the Tanfoglio entities' products were distributed

3

to FIE and another Florida-based company.  In 1991, after FIE went out of business resulting in large losses for Giuseppe S.r.l., Giuseppe S.r.l. was liquidated under Italian law.  Maria Celsa was appointed as Giuseppe S.r.l.'s liquidator and relinquished her position as a director of Fratelli.  During the liquidation, Fratelli, who was Giuseppe S.r.l.'s largest creditor because of debts incurred in the operation of the businesses, remitted debts owed by Giuseppe S.r.l. to avoid bankruptcy in favor of liquidation to pay off all creditors.  Fratelli also purchased some of Giuseppe S.r.l.'s assets and liabilities.  Giuseppe S.r.l.'s final liquidation and dissolution of the entity was completed in 1996, two years before the Jacksons' default judgment against the Tanfoglio entities.

## II

This court reviews a district court's determination of personal jurisdiction de novo.  *McFadin v. Gerber*, 587 F.3d 753, 758 (5th Cir. 2009); *see also Tanfoglio II*, 310 F. App'x at 630; *Tanfoglio I*, 302 F.3d at 521 (stating that the de novo standard applies to challenges to personal jurisdiction brought under Rule 60(b)(4)).  It is the law of the case that Fratelli bears the burden of proof to demonstrate the court lacks jurisdiction.  *Tanfoglio II*, 310 F. App'x at 630–31; *see also Tanfoglio I*, 302 F.3d at 520–21 & n.6.

The limits of the Louisiana long-arm statute are coextensive with constitutional due process limits.  *Walk Haydel & Assocs. v. Coastal Power Prod. Co.*, 517 F.3d 235, 242–43 (5th Cir. 2008) (citing *A&L Energy, Inc v. Pegasus Grp.*, 791 So.2d 1266, 1270 (La. 2001)).  Therefore, the inquiry is whether jurisdiction comports with federal constitutional guarantees.  *See id.* at 243.  A federal district court in Louisiana sitting in diversity may exercise personal jurisdiction over a non-resident defendant if (1) the defendant has purposefully availed himself of the protections and benefits of Louisiana by establishing "minimum contacts" in the state, and (2) the exercise of the jurisdiction complies with traditional notions of "fair play and substantial justice."  *Id.*

4

"Jurisdiction may be general or specific," depending on the nature of the defendant's forum-related contacts. *Luv N'care v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). "Where a defendant 'has continuous and systematic general business contacts' with the forum state, the court may exercise general jurisdiction over any action brought against the defendant. Where contacts are less pervasive, the court may still exercise 'specific' jurisdiction 'in a suit arising out of or related to the defendant's contacts with the forum.'" *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984)).

## A

We dispose of any argument that general jurisdiction over Fratelli exists. General jurisdiction may be found when the defendant's contacts with the forum state are substantial, continuous, and systematic. *Helicopteros Nacionales*, 466 U.S. at 414–19. The "continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). To confer general jurisdiction, a defendant must have a business presence *in* the forum state. *Access Telecom, Inc. v. MCI Telecomm. Corp.*, 197 F.3d 694, 717 (5th Cir. 1999). Injecting a product, even in substantial volume, into a forum's "stream of commerce," without more, does not support general jurisdiction. *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 375 (5th Cir. 1987); *accord Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 216 (5th Cir. 2000) (noting that this circuit has rejected reliance on a stream-of-commerce theory to support general jurisdiction). Advertising and marketing through national media is insufficient, as are isolated visits to a forum. *See Johnston*, 523 F.3d at 612; *Alpine View Co.*, 205 F.3d at 218; *Bearry*, 818 F.2d at 376.

Fratelli must have substantial contacts with Louisiana for the court to have general jurisdiction over it. Fratelli's representatives testified that Fratelli has never had an office, bank accounts, employees, or even a postal address in Louisiana, nor owned or leased any property there. Nor has Fratelli ever been

registered to do business in Louisiana or paid taxes in Louisiana. Fratelli did not directly sell any products in Louisiana. Fratelli's only contacts are: (1) supplying parts or components for the assembly of handguns in Florida, which were then sold throughout the United States by other companies;[4] (2) attendance at two trade shows in New Orleans; and (3) advertising and marketing in nationwide media that reached Louisiana but was not directed to Louisiana. These contacts are neither systematic, continuous, nor substantial enough to support general jurisdiction. *See Johnston*, 523 F.3d at 610–12.

## B

Plaintiffs contend that absent general jurisdiction, the district court has specific jurisdiction over Fratelli based on (1) Fratelli's minimum contacts stemming from its delivery of the Titan .25 caliber pistol into the stream of commerce, and (2) under a theory of imputed contacts.

## 1

This court applies a three-step analysis to determine specific jurisdiction: (1) whether the defendant has minimum contacts with the forum state; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair and reasonable. *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006). We have applied a stream-of-commerce principle to permit the assertion of specific jurisdiction over nonresident defendants that send a defective product into a forum. *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 380 (5th Cir. 2002).

> Where a nonresident's contact with the forum state "stems from a product, sold or manufactured by the foreign defendant, which has caused harm in the forum state, the court has [specific] jurisdiction if it finds that the defendant delivered the product into the stream

---

[4] Fratelli did not supply parts or components or manufacture the 0.25 caliber pistol until after the injury at issue in this case.

of commerce with the expectation that it would be purchased or used by consumers in the forum state."

*Id.* (quoting *Bearry*, 818 F.2d at 374) (alteration in original). Under this "relatively expansive" theory, only "mere foreseeability" that a defendant might be haled into court because it purposely availed itself of the benefits of the forum state is required. *Id.* at n.8. A defendant need not have "purposely direct[ed]" its activities to the forum. *Ruston Gas Turbines v. Donaldson, Co.*, 9 F.3d 415, 419 (5th Cir. 1993).

Plaintiffs contend that Fratelli manufactured, sold or distributed completed products or component parts in Louisiana and specifically targeted Louisiana such that the district court has specific jurisdiction. Although Plaintiffs contend that Fratelli, by itself, has sufficient contacts for specific jurisdiction, their argument—repeatedly referring to "the Tanfoglios" and the "Tanfoglio enterprise"—in fact, conflates Giuseppe S.r.l, Giuseppe S.p.a., and Fratelli and treats the contacts of one entity as applicable to all.[5] There is no challenge to the district court's jurisdiction over Giuseppe S.r.l. and Giuseppe S.p.a. Only Fratelli moved to vacate the default judgment on the grounds of lack of personal jurisdiction. Thus, the question before the court is confined to whether there is personal jurisdiction over *Fratelli*.

Having reviewed the evidence regarding *Fratelli's* contacts with Louisiana, we agree with the district court that Fratelli has met its burden. The evidence shows that Fratelli did not manufacture any Titan .25 caliber pistols until 1993, *after* Jackson was injured, and long after the weapon that caused the injury was

---

[5] For instance, Plaintiffs contend that Fratelli collaborated with Giuseppe S.p.a. and Giuseppe S.r.l. by leasing and selling equipment to one another and advertising, marketing, and shipping firearms together. Plaintiffs further contend that Tanfoglio employees and engineers directed the production of the pistol and were involved in the testing and inspection of the pistol, including providing proper assembly instructions to FIE employees.

produced and sold sometime in the 1970s.[6] The pistol involved in this case was assembled and/or manufactured in Florida by FIE and was sold under the FIE logo. Further, although Fratelli purchased the equipment to bore .25 caliber barrels in 1972 or 1973, there is no evidence that Fratelli was actually boring barrels at that time. Plaintiffs rely only on surmise and conjecture to conclude that because Fratelli possessed the bores it must actually have been making the barrels for .25 caliber pistols. There is also no evidence that *Fratelli* manufactured the .25 caliber firing pin, the pistol's defective component.[7] In short, there is no evidence that Fratelli, as distinct from other Tanfoglio entities, sold or manufactured the pistol, or otherwise "delivered the product into the stream of commerce with the expectation that it would be purchased or used by consumers in the forum state." *Nuovo Pignone*, 310 F.3d at 380. Accordingly, there can be no specific personal jurisdiction.

**2**

Plaintiffs also contend that specific jurisdiction exists through a theory of imputed contacts or alter egos. In other words, they argue that Fratelli is an alter ego of the other Tanfoglio entities and thus, the contacts of those entities can be imputed to Fratelli to satisfy personal jurisdiction.[8]

---

[6] The record includes information about firearms licenses obtained in Brescia, Italy by the other Tanfoglio entities that were necessary for their business activities. There is no license for Fratelli for a .25 caliber pistol.

[7] Massimo Tanfoglio initially testified that Tanfoglio never manufactured the .25 caliber firing pin. He later admitted that the firing pin "could have" been made by *Giuseppe S.r.l.* but "there would be no way to prove" whether Giuseppe S.r.l. or some other entity, including third-party suppliers or FIE, actually manufactured the pin. At best, this evidence might raise a question whether *Giuseppe S.r.l.* manufactured the faulty firing pin. But it certainly does not suggest that *Fratelli* did so. And indeed, the Tanfoglios testimony was consistent in denying that Fratelli made the firing pin.

[8] The district court assumed arguendo that it had specific jurisdiction over the now-liquidated Giuseppe S.r.l. because it manufactured parts for the Titan .25 caliber pistol that injured Jackson, and delivered the product into the stream of commerce with the expectation that it would be purchased or used by consumers in Louisiana. We adopt the same assumption in considering whether the contacts of one entity can be imputed to another.

"[A] court which has jurisdiction over a corporation has jurisdiction over its alter egos." *Minn. Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1265 (5th Cir. 1985); *see also Hargrave v. Fibreboard Corp.*, 710 F.3d 1154, 1159 (5th Cir. 1983). "[F]ederal courts have consistently acknowledged that it is compatible with due process . . . to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court." *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 (5th Cir. 2002). "The theory . . . is that, because the two corporations (or the corporation and its individual alter ego) are the same entity, the jurisdictional contacts of one are the jurisdictional contacts of the other for the purposes of the . . . due process analysis." *Id.*

The district court analyzed the question whether Fratelli is an alter ego of Giuseppe S.p.a. or Giuseppe S.r.l. under Italian law. Plaintiffs contend that this was error because the choice of law for alter ego analysis for personal jurisdiction purposes is different than for liability. Thus, while it may be appropriate to use Italian law to determine alter ego liability, Plaintiffs argue that Louisiana law must be applied to the personal jurisdiction analysis.

Although this complicated choice of law question is an open issue, we need not resolve it here. Even applying the more flexible standard for which Plaintiffs argue, the other Tanfoglio entities' contacts with Louisiana cannot be imputed to Fratelli. Under Louisiana law, the factors to be considered to determine whether one entity is an alter ego of another or whether two entities are a "single business enterprise" are similar. *Green v. Champion Ins. Co.*, 577 So. 2d 249, 257–58 (La. Ct. App. 1991). They include, but are not limited to, common ownership, directors and officers, employees, and offices; unified control; inadequate capitalization; noncompliance with corporate formalities; centralized accounting; unclear allocation of profits and losses between corporations; one

9

corporation paying the salaries, expenses, or losses of another corporation; and undocumented transfers of funds between entities. *See Hollowell v. Orleans Reg'l Hosp. LLC*, 217 F.3d 379, 385–89 (5th Cir. 2000); *Green*, 577 So. 2d at 258. No one factor is dispositive. *Green*, 577 So. 2d at 258.

Some of the factors weigh in favor of imputing jurisdiction. For instance, the Tanfoglio entities appear to have been operated in a way that their brands and products appear identical and their business relationships are deeply intertwined. The Tanfoglio entities shared office space, phone numbers, and the Tanfoglio siblings were officers and directors of each of the Tanfoglio entities. Further, despite the significant business relationship between the Tanfoglio entities and FIE, FIE employees testified that they could not distinguish between each of the Tanfoglio companies and viewed them as one company. As well, the Tanfoglio entities were indebted to one another through a variety of business transactions such that Fratelli was Giuseppe's largest creditor when Giuseppe was liquidated.

On the other hand, there is no evidence of undocumented transfers of funds between the various entities. Indeed, Fratelli produced documentation showing that Giuseppe S.r.l.'s debts to Fratelli were on the books. There was also no evidence of unclear allocation of profits and losses between corporations. Nor was there evidence that one of the Tanfoglio entities paid the salaries of the other entities' employees. Further, there was clear and undisputed evidence that the Tanfoglio companies did not abuse the corporate form, and indeed, followed all of the Italian corporate legalities necessary to maintain distinct entities.[9] The companies maintained separate books, had separate tax

---

[9] To be clear, we consider whether Fratelli complied with corporate formalities because that is one factor to be considered under Louisiana law. *See Hollowell*, 217 F.3d at 385–89; *Green*, 577 So. 2d at 258. However, in considering whether Fratelli abused the corporate form, we must look to the law governing Fratelli's corporate form—that is, Italian law. It would make no sense to consider whether Fratelli complied with Louisiana corporate formalities because Fratelli was not incorporated in Louisiana and was not subject to the rules and regulations governing corporate structures in that State.

10

identification numbers, held separate shareholder meetings, and followed Italian statutory formalities in both the formation of the entities and in the liquidation sale of the Giuseppe entity. The Tanfoglios' former statutory auditor and accountant attended shareholder and director meetings as required by Italian law and prepared and filed reports reflecting those proceedings as required. The statutory auditor repeatedly testified that the Giuseppe S.r.l. and Fratelli's meetings were not held jointly. Further, the accountant testified that while the Fratelli and Giuseppe entities shared office space, the office space of each entity was separate within the buildings. Thus, there is absolutely nothing to suggest that the corporate formalities were not observed at all times.

There is also no support for the argument that the liquidation of Giuseppe S.r.l. resulted in a merger with Fratelli or created successor liability. Under Italian law, the sale of assets from one entity to another does not automatically make the purchaser a universal successor of the vendor. Rather, the sale is of specific, identifiable set of goods. The record does not show that any of Giuseppe S.r.l.'s liability related to this lawsuit was transferred to or assumed by Fratelli. Although Plaintiffs allege that the liquidation and sale of Giuseppe was a "sham," both Fratelli's expert and its former accountant/auditor testified that the liquidation and sale were proper under Italian law. The statutory auditor testified that Giuseppe S.r.l. initially tried to remain a going concern by seeking permission from the Italian courts to incorporate under a different corporate form. However, the Italian court denied that request and ordered a "forced" liquidation. Notably, when Maria Celsa was appointed as Giuseppe S.r.l.'s liquidator, she relinquished her directorship with Fratelli so that she was not involved in both entities' activities during the liquidation. The fact that Fratelli acquired certain assets and liabilities from Giuseppe S.r.l. and forgave a substantial portion of its debts so that Giuseppe S.r.l. could pay other creditors does not point to any impropriety. To the contrary, Fratelli's Italian law expert testified that such debt forgiveness is "definitely legal" and an "accepted and

11

recognized way of payment." Further, according to Fratelli's Italian law expert, a sale of assets or assumption of debts, by itself, could never be a merger because a merger is a distinct, formal legal act, for which specific procedures must be followed under Italian law. The Italian merger procedures did not occur in the liquidation of Giuseppe S.r.l.

Here, there are some factors in favor of imputing contacts and some factors against. Even where some factors suggest that one entity is the alter ego of another, the maintenance of corporate formalities tips in favor of finding that the entities are not alter egos. *Dalton v. R & W Marine, Inc.*, 897 F.2d 1359, 1363 (5th Cir. 1990) (declining to find an alter ego even though one entity owned 100% of its subsidiaries, was responsible for corporate policy, funneled revenues into centralized accounts, and filed consolidated tax returns because those factors were "outweighed, albeit modestly" by observation of corporate formalities). The evidence shows that Fratelli strictly maintained its corporate form, distinct from Giuseppe S.r.l., and thus, the entities cannot be considered alter egos for jurisdictional purposes.

### III

For the foregoing reasons, we AFFIRM the judgment of the district court.